Jeffrey T. Bell (SBN 184876)
Rick Ma (SBN 306994)
Law Offices of Jeffrey T. Bell
11001 Valley Mall Ste 300
El Monte, CA 91731-2620
Telephone: (626) 280-8787 | Fax: (626) 226-5699
service@jtblawyer.com

Attorney for Plaintiffs
 DONG SU; JRANYI ZENG;
LUNCHUN WU; WENXIA YANG;
YU LIAO; XINRAN CHEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONG SU; JRANYI ZENG; LUNCHUN WU; WENXIA YANG; YU LIAO; XINRAN CHEN<br><br>Plaintiff,<br><br>vs.<br><br>HENRY GLOBAL CONSULTING GROUP; GOLDSTONE ADVISORS, LIMITED; TONGZHAO USA CONSULTING, INC.<br><br>Defendants. | CASE NO.<br><br>**CLASS-ACTION COMPLAINT**<br><br>1.   BREACH OF FIDUCIARY DUTY<br><br>**JURY TRIAL DEMANDED** |

## I.   JURISDICTION

1. This court has jurisdiction under 28 U.S.C. § 1332(d)(2), in that this is a civil class action between at least one plaintiff who is a citizen of California and one citizen defendant who is a citizen of a foreign country as well as the fact that the amount in controversy ($200,000,000) exceeds $5,000,000.

2. Specifically, Plaintiff Xinran Chen is a citizen of California where he is domiciled and physically present in United State and makes California his permanent abode in the United States by

among other things having a residence in California and a mailing address in California and an intention to remain in California as his domicile. Defendant Goldstone Advisors Ltd is a registered company in Hong Kong and has its only office in Hong Kong, which would include its executive offices.

3. Various parts of the wrongful conduct alleged herein took place in Alhambra, California.

4. Moreover, the Plaintiff's claims will exceed in the aggregate more than $200,000,000 based on the fact that all Plaintiffs invested $545,000 in various Projects, as described herein, and lost their entire investment. There are likely more than 1,000 plaintiffs that lost the entirety of their $545,000 investment and Plaintiffs, on information and believe, contend the actual number of investors who lost their entire $545,000 is close to 5,000.

## II. VENUE

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district. Specifically, Defendant Henry Global Consulting Group used an Alhambra, California office of Defendant Tongzhao USA Consulting, Inc. as its United States Headquarters (Hereafter "Alhambra Headquarter"). Defendants used the office to communicate with Plaintiffs regarding their investments in various Project which contained false and misleading statements, store Project Documents, as a meeting place between Defendants and Plaintiffs where false statements were made, and a location to prepare all immigration petitions for the Plaintiffs.

## III. PARTIES

6. Plaintiff Dong Su is an individual, citizen of California, and is a resident of Los Angeles.

7. Plaintiff Jranyi Zeng is an individual, citizen of California, and is a resident of Los Angeles.

8. Plaintiff Luchun Wu is an individual, citizen of California, and is a resident of Los Angeles.

9. Plaintiff Wenxia Yang is an individual, citizen of California, and is a resident of Los Angeles.

10. Plaintiff Yu Lia is an individual and citizen of California.

11. Plaintiff Xinran Chen is an individual and citizen of California.

12. Defendant HENRY GLOBAL CONSULTING GROUP (Hereafter "HGCG") is a registered and domiciled company in Canada with offices in China, United States and Canada.

13. Defendant GOLDSTONE ADVISORS LIMITED (Hereafter "Goldstone") is a registered and domiciled company in Hong Kong with offices in Hong Kong. HGCG and Goldstone shared common

1  ownership and had agreed to act together to hide, conceal and fail to disclose what will be described
2  herein as MAA for the sole purpose of hiding these documents from the Plaintiffs and Class members.
3  Goldstone knew that HGCG owed a fiduciary duty to Plaintiffs and Class members and knew HGCG
4  was breaching their duty by failing to disclose the term of the MAA.  Goldstone aided HGCG in
5  breaching its fiduciary duty by failing to disclose the MAA to other migration agent and to potential EB-
6  5 investors and insisting that the MAA be kept confidential.

7  14.   Defendant TONGZHAO USA CONSULTING, INC. (Hereafter "Tongzhao") is a California
8  corporation with offices in Alhambra, California.  Plaintiffs and Class members allege that Tongzhao
9  was actually owned and controlled by HGCG.  Tongzhao earned no money and has no assets.  Instead,
10 Tongzhao is a separate corporate entity in name only as all other corporate formalities have not been
11 conducted and have been conducted at the specific direction by HGCG to make it appear that Tongzhao
12 is a separate corporate entity when it is in fact not.

### IV.   FACTUAL ALLEGATIONS

14 15.   Defendant HGCG is an international immigration investment company with a primary focus on
15 doing business in China.  Defendant HGCG business model was to identify United States Development
16 Projects that were locating to secure EB-5 investment capital using the EB-5 Pilot Program overseen by
17 the United States Custom and Immigration Service.  This program allowed entities, Regional Centers, to
18 pool investor money into large groups and then have those large groups loan out money to different
19 Projects.  In exchange for the loaning of the money, the EB-5 investor could obtain a United States
20 Green Card.

21 16.   This investment vehicle had the following entities involved in the Project:
22        a. Borrower: Entity that was needing the Capital, which varied from Project to Project;
23        b. Regional Center: Entity that was authorized to oversee the EB-5 project by USCIS which
24           varied from Project to Project and in some cases could also be the Borrower;
25        c. Lender: Entity, either Limited Partnership or Limited Liability Company that would be
26           setup as the entity where the EB-5 investor would invest their money and then their
27           pooled money would be then loaned to the Borrower;
28        d. Lender Manager: The General Partner or LLC Manager would oversee EB-5 investor LP

-- 3 --
**CLASS-ACTION COMPLAINT**

or LLC and was an entity either owned or controlled by HGCG;

e. Master Migration Agent: Either HGCB or another entity contracted by HGCB to hold the master migration agreement (agreement that would allow a party to market and sell the EB-5 project to potential investors) with the Borrower and Lender.

f. Migration Agent: The person or entity, like HGCB, who would directly market and sell a Project to potential EB-5 investors.

17. Defendant HGCG would initially secure an agreement with the Borrower and/or Regional Center to allow it to market and sell a particular EB-5 Project. Defendant HGCG typically had a pool of more than 1,000 qualified Chinese EB-5 investors at any one time.

18. The agreement secured by HGCG with either the Borrower and/or Regional Center would include that HGCG would receive fees for securing EB-5 investments and keeping those EB-5 investors in the Project until the end. These fees were referred to as finder fees or migration agent fees in the agreements HGCG would enter into. These agreements will be hereafter referred to as "Migration Agent Agreements or MAA." The MAA would require either the Borrower or the Lender to pay HCGC fees for EB-5 investors getting their immigration petitions (I-526) approved(I-526 was the first step in the approval process) and then fees based on the total amount of the EB-5 invested money per project on an annual basis. The total annual fees due based on the amount invested in a particular Project was between 5 to 7 percent. The total finder fees due per investor was typically $20,000. With many investment EB-5 Projects having 100s millions invested, the amount of fees per Project over the life of the Project exceeded $50 million.

19. The EB-5 loan interest was typically less than 1% and was typically paid at the end of the loan term. HGCG was using its position to charge EB-5 Borrowers fees that should really have been interest on the loan that should have been to the benefit of the EB-5 investor.

20. Depending on the size of each EB-5 Project, HGCG would either act as the sole Migration Agent or would designate another entity to act as the Master Migration Agent, such as Defendant Goldstone Advisors Limited, and then HGCG would sell the EB-5 Project along with other migration agents in China. Where HGCG was not acting as the sole Migration Agent, HGCG would direct its appointed Master Migration Agent to hide and conceal the true amount of fee owed under the MAA so the other

Migration Agent would not disclose these fees to their EB-5 investors, like Plaintiffs and Class Members.

21.  In selling the EB-5 Projects to EB-5 Investors, like Plaintiffs and Class members, HGCG would first enter immigration agent agreements (Hereafter "IAA") with potential EB-5 investors.  The IAA would require potential EB-5 Investors to pay between $2,500 to $3,000 under the IAA to secure the services of the migration agreements, like Defendant HGCG.  In exchange for this money, the migration agent would introduce various EB-5 Projects to potential EB-5 Investors.  In many cases, HGCG would create promotional material that would not be in compliance with any known security regulations.  This promotional material would provide any overview of a potential EB-5 Project.  Plaintiffs and Class members did enter into IAA agreements with migration agreement that were acting under MAA managed and controlled by HGCG.

22.  In addition to introducing the EB-5 Project, HGCG also agreed to act as the immigration agent for the EB-5 investor, which included preparing and/or assisting with the preparation of all immigration documents, acting as the EB-5 investor's personal representative to speak with and coordinate all services performed by EB-5 investor immigration attorney, and acting as the EB-5 investor's personal representative in charge of all communication with the General Partner or LLC Manager regarding the Limited Partnership or LLC.  Plaintiffs, except Plaintiff Chen, and Class members retained HGCG as their immigration agent.  Plaintiff Chen and other Class Members entered into IAA with other migration agent.

23.  The migration duties and powers on behalf of the EB-5 Investor, like Plaintiffs and Class members, were specifically provided for in contractual agreements that were signed when a potential EB-5 Investor signed a subscription agreement to join a particular EB-5 Project.  HGCG and the other immigration agents then used these agreements to control the flow of information available to EB-5 Investors.  If any questions were raised by the EB-5 Investor to their own immigration attorneys or directly to the General Partner or LLC Manager, those parties to direct the EB-5 investor, like Plaintiffs or Class members,  to ask HGCG or the other immigration agent first and then let HGCG or the immigration agent ask the questions.

24.  To further HGCG's control over the transaction, HGCG would install as the General Partner or

**CLASS-ACTION COMPLAINT**

1  LLC Manager an entity that was either owned or controlled by HGCG.

2  25.  At no time would HGCG allow for any party involved in an EB-5 Project to disclose the terms of the MAA to potential EB-5 Investors, like Plaintiffs and Class members. The EB-5 Project Documents and Subscription Agreements would not identify or disclose the terms of the MAA. Instead, the EB-5 Project Documents and/or Subscription Agreements provided specific information regarding migration agent fees and finder fees that would conceal the true amount of those fees due under the MAA.

26.  Once the EB-5 Investor signed the Subscription Agreement, the were not actual members of either the LP or LLC and their monies ($545,000) would not be invested in the EB-5 Project. Instead, the EB-5 Investor's money would be held in escrow until their I-526 was approved. The Subscription Agreements would provide that EB-5 Investors, like Plaintiffs and Class members, would not be members of the LP or LLC until their I-526 was approved and their investment money was invested in the EB-5 Project. All of the Subscription Agreements provided a means by which a potential EB-5 investors could withdraw from the EB-5 Project prior to their I-526 approval or if their I-526 was denied.

27.  The time between when the EB-5 Investor, like Plaintiffs and Class members, signed the Subscription Agreement and was fully committed to the EB-5 investment with their I-526 approval was a period of time where HGCG or other immigration agents could have and should have fully disclosed the contents of the MAA prior to the EB-5 investors being fully committed. However, HGCG or the entity acting as the Master Migration Agent, like defendant Goldstone, would deny and command that no immigration agent could disclose the terms of the MAA or that the MAA existed.

28.  On all EB-5 Projects where HGCG had enter into MAA, the monies due under those MAAs jeopardized and put at risk the Borrower's ability to pay back the EB-5 loan. In many cases, EB-5 Projects failed because of the amount of the MAA fees due to HGCG.

29.  HGCG failure to disclose the existence of the MAA left many EB-5 investors to uncover that had been a victim of a failure to disclose the terms of the MAA.

## V.   CLASS ALLEGATIONS

30.  **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. Rule 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class") defined as follows:

> "All person in the United States who hired HGCG or another immigration agent to act as their immigration agent and who invested in an EB-5 Investment Project in the United States where HGCG or its designee entered into a MAA with the Borrower."

Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interests, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case assigned and the Judge's immediate family; (3) any person who executes and timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such claim.

31.  **Numerosity**: The Class is so numerous that joinder of individual members would be impracticable. HGCG acted as immigration agents for approximately 10,000 people a year for several years of which more than 10,000 individuals are in the United States and who fall within the Class Definition.   The true number of potential Class members are unknown and the above numbers are based on public announcement of HGCG as to the numbers of EB-5 investors it has as clients.

32.  **Ascertainability**: Class members can be easily identified through Defendant HGCG's own records, which do include IAA with each Class member and each Class member's immigration documents still in HGCG custody and control.   Defendant HGCG can also easy ascertain the identity of each EB-5 Project for each Class member.

33.  **Commonality and Predominance**: There are several questions of law and fact common to the claims the Plaintiffs and members of the putative Class, which predominate over any individual issues, including:

   a. Whether HGCG owed a fiduciary duty to Class Members based on the IAA;
   b. Whether HGCG owed a fiduciary duty to Class Members based their agreement to act as the Class Members' representative with Class Members' immigration attorney;
   c. Whether HGCG owed a fiduciary duty to Class Members based on their agreement with the Class member to act as the Class Members' representative with the EB-5 Project;
   d. Whether HGCG disclosed the MAA terms to Class Members;

e. Whether HGCG's failure to disclose the MAA terms to Class Members breached HGCG's fiduciary duty to Class Members;

f. Whether HGCG's failure to disclose the MAA terms to Class Members was a substantial factor in causing Class Members harm;

g. Whether Goldstone disclosed the terms of the MAA to Class Members;

h. Whether Goldstone instructed immigration to not disclose the terms of the MAA to Class Members;

i. Whether Goldstone owed a fiduciary duty to Class Members;

j. Whether Goldstone aided and abetted HGCG in its breaching of a fiduciary duty;

k. Whether Tongzhao owed a fiduciary duty to Class members;

l. Whether Tongzhao aided and abetted HGCG in its breaching of a fiduciary duty;

m. All Class members invested $545,000 to join their EB-5 Project;

n. Each EB-5 Project contains between 25 to upward of 800 Class Members.

o. Whether HGCG's wrongful conduct caused Class Member's harm in the loss of their $545,000 EB-5 investment.

34. **Typically**: Plaintiffs' claims are typical of the claims of the proposed Class. All claims are based on the same legal and factual issues, to wit: Defendants failure to disclose the terms of the MAA.

35. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of proposed Class. Plaintiffs do not have any interests antagonistic to those of the proposed Class. Plaintiffs have retained competent counsel experienced in the prosecution of this type of litigation, specifically litigation regarding EB-5 investment claims. The questions of law and fact common to the proposed Class members predominate over any questions affecting only individual Class members.

36. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. Individual actions are not economically feasible. The trial and the litigation of the Plaintiffs' claims are manageable.

37. Unless a class is certified, Defendant will retain the monies received as a result of its wrongful conduct.

## VI. FIRST CAUSE OF ACTION FOR BREACH OF FIDUCAIRY DUTY AGAINST HGCG

38. Plaintiffs repeat and re-allege the allegations in Paragraphs 1-37 with the same force and effect as though fully set forth herein.

39. HGCG, Goldstone and Hongzhao owed a fiduciary duty to Plaintiffs and Class members.

40. HGCG, Goldstone and Hongzhao breached their fiduciary duty to Plaintiffs and Class members by failing to disclose the terms of the MAA prior to Plaintiffs and Class members investing in their respective EB-5 Projects and during the period of time from when they invested and their money was fully committed to the EB-5 Project.

41. Defendants wrongful conduct was a substantial factor in causing Plaintiffs and Class Members' harm.

42. As a proximate and direct result of Defendants' wrongful conduct each Plaintiff and Class Member lost EB-5 investment of $545,000 and profits from their investment.

PRAYER FOR DAMAGES

Wherefore, Plaintiffs DONG SU; JRANYI ZENG; LUNCHUN WU; WENXIA YANG; YU LIAO; XINRAN CHEN individually, and on behalf of the Class pray for an Order as follows:

 A. Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein;

 B. Designating Plaintiffs as representative of the Class and their undersigned counsel as Class Counsel;

 C. Entering judgment in favor Plaintiffs, the Class and against Defendant;

 D. Awarding Plaintiffs and the Class damages equal to the amount of actual damages that they sustained, including interest thereon;

 E. Granting all such further and other relief as the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Qiu Lan He hereby demands a trial by jury as to all claims in this litigation.

DATED: March 6, 2020                               Law Offices of Jeffrey T. Bell

                                        By: _____/s/ Jeffrey Thomas Bell_____
                                             Jeffrey T. Bell, Esq.
                                             Rick Ma, Esq.
                                             Attorneys for Plaintiffs

**CLASS-ACTION COMPLAINT**